92 N.J. Super. 184 (1966)
222 A.2d 541
GRACE OTT AND GEORGE SHASHOIAN, PLAINTIFFS,
v.
TOWN OF WEST NEW YORK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND JAMES CANINO, ALVIN RAPHAEL AND LAURENCE MARCHINI, A CO-PARTNERSHIP, TRADING AS OVERLOOK TERRACE CO., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 1, 1966.
*188 Mr. Seymour Goldstaub, attorney for plaintiffs.
Mr. William V. Breslin, attorney for defendants James Canino, Alvin Raphael and Laurence Marchini, a co-partnership, trading as Overlook Terrace Co.
Mr. Samuel L. Hirschberg, attorney for defendant Town of West New York.
*189 CARTON, J.S.C.
Plaintiffs Grace Ott and George Shashoian attack the validity of a contract between defendant Town of West New York, acting as the local public agency (agency), and defendants James Canino, Alvin Raphael and Laurence Marchini, a co-partnership, trading as Overlook Terrace Co. (Overlook) for the sale of land to the latter for private redevelopment.
On January 13, 1966 the agency sent invitations to 15 developers to submit proposals on or before February 15, 1966 for the purchase and acquisition of lands comprising the urban renewal area of the Boulevard East Project N.J.R. 101. The letter of invitation read in part as follows:
"If you are interested, will you please transmit your proposal setting forth the amount you offer to pay for the acquisition of said lands, which should be a minimum of $2.00 per square foot, or a total of $317,150.00. The said figure is to be used for negotiation purposes only, and subject to the approval of the Urban Renewal Administration and the Federal Housing Administrations' concurrence. Your proposal shall also set forth your experience and qualifications as a developer in detailed financial statement and other pertinent data."
The letter stated that proposals must be based on the urban renewal plan, and enclosed a copy thereof. Also enclosed were forms for the redeveloper's statement for public disclosure and statement of qualifications and financial responsibility.
The renewal plan referred to had been approved by the municipality by ordinance adopted January 17, 1964, as amended by ordinance of January 5, 1966.
The reuse plan for the project known as "Boulevard East" comprises four parcels of vacant land, consisting of 3.64 acres, to be developed for residential use with high-rise apartments. This property is bounded generally on the east by Kennedy Boulevard, on the south by 56th Street, on the north by 59th Street, and on the west by an irregular line west of Park Avenue. It is located in an area in which several new high-rise luxury apartments have been constructed. All of *190 these sites, including that of the project area, afford unobstructed views of the New York City skyline.
The cost of the facilities to be erected by the redeveloper is expected to be upwards of $9,000,000. The Federal Government has invested about $1,600,000 and the municipality about $300,000 in the project.
On February 16, 1966 three proposals were received, which offered price and proposed monthly rent schedules as follows:

 Overlook  $320,000
 One room efficiency apartment ........................ $ 91 per month
 One-bedroom apartment ................................ 110 per month
 Two-bedroom apartment ................................ 131 per month
 Three-bedroom apartment .............................. 151 per month
 Inganamortm  La Sala  $420,225
 Studio apartment ........................................ $100  $120
 One-bedroom apartment ................................... 120  140
 Two-bedroom apartment ................................... 140  165
 Three-bedroom apartment ................................. 175  200
 Trimen Construction Corporation  $506,550
 One-bedroom apartment (jr.) .................................... $160
 One-bedroom apartment (large) .................................. 195
 Two-bedroom apartment .......................................... 240

On February 17, February 23, February 28 and March 2, 1966 the agency held special meetings to review the proposals received. At these meetings members of the agency reviewed an analysis of the three proposals submitted and a report dated January 10, 1966 from Robert W. Hendricks, a real estate appraiser, recommending the utilization of the property for construction of an F H A 221-D-3 (middle income rental) project, rather than for high-rise luxury apartments. His report reads in part:
"Consideration should also be given to the fact that the disposition price of the subject land is one of the highest for an F H A 221-D-3 project to my knowledge. Any attempt by the community to force a higher price may defeat the very purpose for which the land is to be used. If too high a price is obtained for the land, it may not be economically feasible to develop the site under the F H A 221-D-3 concept."
*191 On March 16, 1966, after another special meeting on the subject, the agency adopted a resolution which recited that the disposal of the property by negotiation was determined to be the appropriate method of making the property available for redevelopment, and that the price offered by Overlook was not less than the fair market value of the property for its use in accordance with the urban renewal plan. Upon concurrence by the Federal Government, the resolution authorized the execution of a contract for the sale of the property for $320,000 to Overlook after ten days' publication of a notice in the form attached to the resolution of the agency's intention to do so.
Overlook's representatives signed the contract on March 16, the day when the resolution accepting its offer was adopted.
The notice form attached to the resolution referred generally to the terms of the proposed contract, and that the agency "proposes to execute said contract on or after March 31, 1966."
The notice was not actually published until April 23, although it followed literally the form of notice attached to the resolution in reciting that the agency proposed to execute the contract "on or after March 31, 1966." On April 20 the regional director of Urban Renewal approved the agreement and concurred in the agency's determination that the proposed sale price was "not less than fair value for use in accordance with applicable controls."
On May 11, 1966 the agency executed the contract. No objections or requests for examination of the contract documents had been made or filed prior to that date with the agency or its executive director.
On June 7, 1966 plaintiffs, as residents, and by one of them as a taxpayer of the Town of West New York, filed this action in lieu of prerogative writs to declare the contract null and void and to restrain defendants from taking further action under it. Motions for summary judgment made by both defendants were denied by the court, and a restraining *192 order issued on the filing of the action was continued until final hearing. In view of the nature of the project and the public interest involved, all phases of the case, including a preliminary hearing in the presence of the court, have been accelerated by order of the court and through cooperation of counsel for the parties, with the objective of having a prompt determination of all issues on the merits.
Plaintiffs base their challenge to the contract on the alleged violation of various state and federal statutes and regulations, as well as upon the charge that the members of the agency acted arbitrarily and capriciously and violated a fiduciary duty in accepting the Overlook offer of $320,000 for the purchase of the property. Before considering these issues it is necessary, however, to decide, as defendants contend, whether plaintiffs are precluded, by reason of R.R. 4:88-15, from bringing this action.
R.R. 4:88-15(a) provides as follows:
"No proceedings for review, hearing and relief in lieu of prerogative writs shall be commenced, unless it shall be commenced within 45 days of the accrual of the right to such review, hearing or relief * * *."
R.R. 4:88-15 (b) (4) provides:
"No proceeding in lieu of prerogative writ shall be commenced * * *
(4) [T]o review an ordinance, authorizing the construction of a railroad siding or sidings, or an ordinance or resolution for a public improvement in any municipality, after 30 days from the date of the passage or adoption of such ordinance or resolution."
Defendants assert that whether the 45-day limitation period provided in R.R. 4:88-15 (a) or the 30-day period prescribed in R.R. 4:88-15(b) (4) applies, plaintiffs' action is barred because their right to review accrued on March 16, 1966, the date of the adoption of the resolution accepting Overlook's proposal. The court disagrees.
The resolution adopted on that date did not purport to authorize the immediate execution of the contract with Overlook. The municipal officials were authorized to execute the *193 contract on behalf of West New York at any time after ten days following the publication of the notice of the agency's intention to do so. The notice was not published until April 23. The contract was not executed on behalf of West New York until May 11. It is the opinion of the court that plaintiffs' right of review did not accrue until the date when the contract became binding on all signatories to it. That date was May 11. Since plaintiffs' action was filed on June 7, they are not barred by either R.R. 4:88-15(a) or R.R. 4:88-15 (b) (4).
Moreover, even if plaintiffs' right to relief can be construed to have accrued on March 16, 1966, it is manifest to this court that the interests of justice require the period of time to be enlarged to permit this action.
The project concerned in this suit is one of considerable magnitude and involves the expenditure of large sums of public funds. The issues raised are important and vitally affect the public interest. Defendants have not demonstrated that their interests have been materially prejudiced by any delay in bringing this action. In addition, they are in no position to complain of the alleged delay on the part of plaintiffs, bearing in mind that the form in which notice was published referred to a date which had already passed as the date when the agency intended to execute the contract. This error in the notice certainly rendered it ambiguous. For the purpose of determining whether this action has been timely brought, any doubt as to whether the notice brought home to interested persons the date of proposed action on the part of the agency must be resolved in favor of plaintiffs.
We turn now to the merits of the case. Plaintiffs urge that the contract of sale is invalid because the municipality failed to advertise the lands for sale pursuant to N.J.S.A. 40:60-26. They argue that the competitive bidding statutes are applicable to the present sale because the municipality acted as the local public agency. This argument misconceives the language and purpose of the New Jersey statutes relating to urban redevelopment.
*194 The board of commissioners of the town, by resolution dated November 30, 1961, established the urban renewal agency and designated itself as the agency pursuant to N.J.S.A. 40:55C-37, to exercise the powers conferred by the act. N.J.S.A. 40:55C-53 specifically authorizes the governing body of the municipality or the agency, by resolution, to make the land available for urban renewal by private sale upon such terms and conditions as shall be agreed upon by the municipal corporation or agency.
Where, as here, the governing body has been qualified to act as the local public agency, it is clothed with all the authority conferred upon any other local public agency. That authority included the power to sell the land by private sale. The municipality was therefore not required to advertise the lands for sale or to comply with the competitive bidding statutes.
The evidence establishes that the land to be sold under the contract with Overlook includes an area of about 9,000 square feet, comprising a small portion of 57th Street lying between Park Avenue and Boulevard East. This area was added to one of the parcels for inclusion in the plan for the renewal project when it was decided to vacate the public interest in this street. An ordinance formally vacating this street has not yet been adopted.
Plaintiffs urge that the prospective conveyance of the renewal area would be contrary to R.S. 40:60-27 and R.S. 40:60-28. The first of these provisions states that the authority given to municipalities to sell municipal land under R.S. 40:60-26 shall not apply to sale of park lands or streets, and prohibits such a sale except in exchange for other lands contiguous to such park lands or streets, and then only for the purpose of straightening or rendering symmetrical the boundary or boundaries of the park land or streets.
R.S. 40:60-28 reads as follows:
"Whenever any road, street, highway, lane or alley has been or shall hereafter be lawfully altered or relocated in such manner as to leave a portion of the original road, street, highway, lane or alley not *195 needed for public use, and the municipality has or shall have vacated or released the public rights therein, the municipality, if it be the owner of the fee of said land, may make a private sale of and convey the lands so vacated to the adjoining property owner or owners at such price as it may deem fair and just. The provisions of section 40:60-26 of this title shall not apply to such sale."
The apparent purpose of R.S. 40:60-27 was to protect the public from the consequences of the sale of any park land or public streets required for use as a part of a park or as a part of the municipality's system of streets, except under the conditions outlined in that statute. R.S. 40:60-28 specifically authorizes a municipality to sell at private sale to an adjoining property owner any street not needed for public use. Such sale may not be made, of course, until an ordinance has been adopted determining that the street in question is no longer needed for public use, and vacating the public interest therein.
It is true that Overlook is not technically holder of the legal title to the adjoining property at this time. However, it has become equitable owner by virtue of the contract of sale. For purposes of the statute, such equitable ownership may well be sufficient to satisfy the requirements of R.S. 40:60-28 as to ownership.
The Legislature has conferred upon the agency broad power to sell, assign or release, upon such terms and at such prices as it determines to be reasonable, any right, title, claim, lien or interest in real or personal property. N.J.S.A. 40:55c-12 (h).
N.J.S.A. 40:55C-39 provides:
"The powers conferred by this act shall be in addition and supplemental to the powers conferred by any other law."
Furthermore, the Legislature has authorized any municipality or other public body to do any and all things necessary to aid and cooperate in the planning and undertaking of a redevelopment project in the area in which any municipality *196 or public body is authorized to act. N.J.S.A. 40:55C-34. See also N.J.S.A. 55:14A-40 and 55:14B-10.
It is common knowledge that urban renewal projects often encompass large areas and involve the acquisition and assembly by the municipality of numerous parcels of urban land. The effective redevelopment of such area obviously may require the realignment or vacation of public streets separating or adjoining such parcels, as well as the sale to the redeveloper of such streets or portions thereof in which the public has no further interest and which, by their inclusion in the sale, may improve the redevelopment project. To withhold from the agency the power to do so might well frustrate the beneficial purpose of the renewal statute.
I am satisfied that the Legislature conferred upon the municipality the power to make such sale by the provisions of the renewal act referred to. I conclude that the agency had the power to enter into a contract to sell its interest in the street and make conveyance thereof upon vacation of the public interest therein by a duly adopted ordinance for this purpose.
Plaintiffs also assert the contract to be void because of the failure of the agency to comply with the Housing Act of 1949 (42 U.S.C.A., § 1441 et seq.) and certain rules and regulations adopted by the Urban Renewal Administration as set forth in the Urban Renewal Manual. The court is of the opinion that whether or not the federal statutes or regulations have been violated is of concern only to the Housing and Home Finance Administration. Consequently, plaintiffs have no standing to raise any objection in this proceeding to any alleged violations.
The court is also satisfied, from its review of the record, that there has been substantial compliance with the federal requirements allegedly violated. In this connection it is noted that the Regional Director of Urban Renewal approved the award of the contract to Overlook on April 20, 1966 and concurred in the proposed disposition price of the land involved.
*197 Plaintiffs' principal charge is that the agency acted capriciously and arbitrarily in accepting Overlook's proposal to purchase the property for $320,000 when it was in receipt of two proposals offering to pay $420,225 and $506,550, respectively. Related contentions are that, in accepting the lowest bid, the agency violated a fiduciary obligation owed to the people of the municipality and that such action was an infringement of Article VIII, § III, par. 3 of the 1947 New Jersey Constitution, which prohibits municipalities from making donations of land or appropriations of money for the use of a private association or corporation.
Defendants insist that this court lacks the power or jurisdiction to inquire into its action except to consider whether the requirement of N.J.S.A. 40:55C-15(d), that the property shall not be sold for less than its fair use value, has been complied with, and to ascertain whether the proofs demonstrate the absence of a bona fide endeavor to fulfill the purpose of the redevelopment statute authorizing the disposition by private sale. They deny that their action was arbitrary or capricious, or in violation of a fiduciary duty, and they maintain that the determination of the agency represented the exercise of a business judgment in the best interest of the municipality.
The general principles are clear. Courts will not substitute their judgment for that of a municipal governing body in matters solely involving questions of judgment. They will not infiltrate the realm of business judgment which resides in municipal officials. It is equally clear that possible illegality or avoidance of the spirit or purpose of the laws and principles controlling governmental action cannot escape judicial scrutiny under the guise of business judgment. The absence of corrupt motive, or even the presence of good faith, does not alone preclude judicial examination or remedy. Edelstein v. City of Asbury Park, 51 N.J. Super. 368 (App. Div. 1958); Asbury Park Press, Inc. v. City of Asbury Park, 23 N.J. 50, 55 (1956); 2 McQuillin, Municipal Corporations (3d ed.), § 10.37.
*198 It may well be, as defendants here urge, a proper exercise of municipal business judgment to accept an offer for the purchase of municipally-owned property, at a price which is substantially less than that offered by others, in order to accomplish valid municipal objectives. It does not follow that this court may not review that action to ascertain whether the municipal officials in fact exercised the discretionary power conferred upon them, and whether those objectives were real or merely colorable. The discretion which is immune from review is an honest and not a purely arbitrary one. The fact that the Legislature has seen fit to exempt municipal land sold for urban redevelopment from the requirements of the competitive bidding statutes, and to permit it to be sold by private sale, does not mean that such discretionary power is untrammeled. This court clearly has the jurisdiction to review the action of the municipality in the present case, and the public interest requires that such jurisdiction should be exercised.
The official minutes of the board of commissioners, acting as the urban renewal agency, establish that the members held four separate meetings between the date the proposals were received on February 16 and March 16, 1966, for the purpose of examining, studying and analyzing the proposals submitted. Lawrence T. Harvey, who is a member of the Division of Local Government in the Department of the Treasury of New Jersey, and who headed the Division of Finance in West New York since 1963, testified that there was discussion at the various agency meetings regarding each bid and the type of multi-dwelling units most desired for the town  that is, whether the project should be of a luxury, middle income or low cost nature. He said that the object of the solicitation of bids was not to get bids for section 221(d) housing solely, but to invite all developers to submit proposals that could be studied by the agency so that a determination could be made as to what the membership felt would be in the best interest of the Town of West New York. He said that although the agency had received the Hendricks reuse *199 approval in the fall of 1965 and the members of the Agency had considered it, there had been no leaning on the part of the members of the agency towards middle or low income housing, and that it was not until March 16, 1966 that the agency actually decided to accept the Overlook proposal. It was his judgment that it was not economically feasible to obtain the higher price for the land and still provide the desired low cost or medium cost housing desired. He testified that the possibility of getting both a higher price for the land, as well as the type of housing most desirable from the community standpoint, was the subject of a considerable conversation among the commissioners.
John R. Armellino, Mayor of West New York for the past 12 years and head of the renewal agency, described the nature of the discussions at the meetings of the agency to consider the proposals:
"The general subject matter that was discussed, that we took each proposal, and there were three proposals, and each of these proposals were studied from point of view of the financial status of the individual, corporation or partnership. We took the background of the individuals. We studied the proposals, most important of all from the point of view of the rentals which we felt would be to the best interests of the Town of West New York. We studied the proposal land price, which would reflect in the rentals, and did reflect in the rentals. And we also studied the experience of the developers."
He said that about February 23, 1966 the agency received from its director, Joseph M. Pizzuto, an analysis of the various proposals, and relied in part on that analysis in determining to accept the Overlook proposal. He said that the price offered for the property, as well as the type of housing proposed to be constructed, was considered, and that in deciding to accept the Overlook bid greater weight was given to the rental schedule proposed in the latter bid. His explanation of the price differential was that the prices offered for the land by the various bidders reflected the differences in the rental schedules of the three bids.
*200 The testimony of John E. Otis, another member of the agency, and Mr. Pizzuto, its director, was substantially to the same effect. The action of the agency was unanimous.
Plaintiffs have offered no evidence challenging the propriety of the agency's determination that the best interests of the municipality would be served through use of the project for construction of middle income housing. Indeed, it would be difficult to controvert this determination in the light of the extensive data set forth in the reuse valuation appraisals made by Robert W. Hendricks, a member of the American Institute of Real Estate Appraisers, and the consultants of Frederick M. Babcock & Co. and their review of the population, social and economic characteristics of the Town of West New York and the surrounding region.
A comparison by family groups of residents of the Town of West New York in 1960 showed that 32.47% had a family income of $5,000, 54.7% between $5,000 and $10,000, and 13.0% above $10,000. The appraisers express the unqualified opinion that the site can best be improved through construction of apartments of the kind called for by the renewal plan, offered at moderate rents. Both reports assume that such apartment construction must be financed through F H A 221(d) (3) mortgage financing in order to achieve such rentals.
Certain additional aspects of the action taken by the agency to which plaintiffs have taken exception require comment.
They assert that the solicitation for bids specified that the proposals were for negotiation purposes only, and that although the agency made the award on the basis of middle income housing, it failed to negotiate despite the fact that both unsuccessful bidders indicated a desire to negotiate on such a basis. The clear weight of the evidence is to the contrary, and the court so finds. Mayor Armellino testified that after receipt of the bids he had further conversations with Gene Palmieri, one of Trimen's principals, and in discussing their proposal informed him that one of the most *201 important aspects of the successful bidder's proposal was that it provided middle income housing determined best for the community. They discussed how the cost of the land would be reflected in the rentals. He said that Palmieri at no time offered to meet the desired rent schedule, and at the conclusion of the conversation stated he was no longer interested.
He testified he had a similar conversation with Messrs. Inganamort and Introcaso of the Inganamort-La Sala concern, and they also stated they were no longer interested, after a discussion of the land price and its effect on the desired rentals.
These conversations, Armellino testified, were reported to the members of the agency at one of its meetings.
None of the principals of the unsuccessful bidders was produced as a witness to contradict any of this testimony. Plaintiffs called as a witness Bernard Schwarz, who represented Trimen in the submission of its bid, and who wrote Armellino on February 24 requesting an opportunity to confer about the award, and again on March 7 requesting information as to when the bids for the project would be made public. No particular significance can be attributed to his testimony that he received no answers to either of these letters, in view of Mayor Armellino's testimony that Palmieri had informed him when they discussed the award that Schwarz no longer represented Trimen.
It seems clear that the essence of plaintiffs' complaint is that the agency did not receive an adequate price for the property which was sold. This contention appears to be grounded on the belief that once the agency appeared to have embarked upon a competitive price program by the solicitation of bids, it somehow violated a fiduciary duty by taking into consideration the community's need for middle income housing, as well as the price to be paid for the land, as factors in making the award.
This argument has no merit. The Legislature conferred broad power upon the agency to proceed with the redevelopment *202 of the area in order to carry out and effectuate the purposes of the Renewal Act. It placed no limit upon the power to dispose of the land by private sale except that it be made available at, not less than, its use value as determined by the agency in order that it might be redeveloped for the purposes specified in such plan. N.J.S.A. 40:55C-14 and 40:55C-15.
The price for which the property was sold meets that requirement. It was within the power of the agency to determine that the benefits of the community sought to be achieved by the construction of middle income housing outweighed the dollar return from a higher sale price of the land. It was likewise within the agency's discretion to determine that both objectives could not be attained under the circumstances.
It may be that some of the difficulties which confront the agency in this case might have been avoided by fixing the price of the land and inviting developers to submit architectural schemes, or by specifying in advance the type of housing and rentals desired. See Scheuer, Goldston and Sogg, "Disposition of Urban Renewal Land  A Fundamental Problem in the Rebuilding of Cities," 62 Colum. L. Rev. 959 (1962). However, the agency was not required to follow any particular procedure in disposing of the land, or precluded from changing that procedure at any time if it saw fit to do so. These matters are likewise left to the judgment and discretion of the members of the agency. See Greenberg v. Fornicola, 37 N.J. 1 (1962), and Jersey City Merchants Council v. City of Jersey City, 39 N.J. 42, 52 (1962).
The court is satisfied that there is no proof that any member of the agency violated any fiduciary obligation owed to the community. The court is also satisfied that there has been no showing that that discretion has been arbitrarily or capriciously exercised. With the wisdom of the judgment in exercising that discretion, the court has no concern.
Finally, plaintiffs contend that the acceptance of the lowest bid, when there were higher bids received, offends Art. VIII, § III, par. 3 of the 1947 New Jersey Constitution. This provision prohibits municipalities from making a donation of *203 land or appropriation of money to or for the use of any society, association or corporation.
The agency determined that the long-term goal of improving the future of the municipality was of greater benefit to the community than the immediate dollar return which might be gained by obtaining a higher price for the land. In agreeing to sell the property at a price designed to accomplish that objective, the agency received a consideration which it bargained for. The court will not inquire into the adequacy of that benefit. It cannot fairly be said to be inadequate or grossly insufficient. The town's action was well designed to serve the public health, safety or welfare, and was well within the police power. Consequently, there was no violation of the Constitution. See McClintock v. City of Trenton, 47 N.J. 102 (1966), and City of East Orange v. Board of Water Commissioners, 79 N.J. Super. 363 (App. Div. 1963), affirmed 41 N.J. 6 (1963).
The complaint is dismissed and the interlocutory injunction heretofore granted is vacated.
No costs.